896 F.Supp. 1085 (1995)
Russell STOVER and Marge Stover, Husband and Wife, Plaintiffs,
v.
EAGLE PRODUCTS, INC., Defendant.
No. 93-4047-SAC.
United States District Court, D. Kansas.
August 17, 1995.
*1086 Gavin Fritton, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Overland Park, KS, G. Michael Fatall, Sanders & Simpson, P.C., Kansas City, MO, for Russell Stover, Marge Stover, Helen Shelley, Catherine Boehm, Jean Van Epps and Pam Stallbaumer.
Judy A. Pope, Dickson & Pope, P.A., Topeka, KS, G. Michael Fatall, Sanders & Simpson, P.C., Kansas City, MO, for Jean Van Epps.
James P. Nordstrom, Donald Patterson, Fisher, Patterson, Sayler & Smith, Topeka, KS, for Eagle Products, Inc.

MEMORANDUM AND ORDER
CROW, District Judge.
In this diversity of citizenship, products liability action, the plaintiffs, Russell and Marge Stover, claim that they have suffered economic loss due to the breaches of the implied warranty of fitness for a particular purpose and of the implied warranty of merchantability by the defendant, Eagle Products, Inc., a seller of dog food. The Stovers also contend that Eagle Products is liable under a theory of strict liability. The Stovers claim that Eagle Products' feed product was low in calcium, causing certain defects and abnormalities in their dogs which they raised for sale. The Stovers seek damages in the amount of $300,000.
This case comes before the court upon the following motions filed by Eagle Products:
1. Motion for Summary Judgment (Dk. 107).
2. Motion to Strike Affidavit (Dk. 114).
Eagle Products' motion for summary judgment is primarily a challenge on the issue of causationHave the plaintiffs presented sufficient evidence for a rational factfinder to conclude that there was a causal relationship between the Stovers' use of Eagle Products' dog food and the defects and abnormalities in the Stovers' dogs? Specifically, Eagle Products argues that the testimony of the plaintiffs' experts does not meet the standards of admissibility under the Federal Rules of Evidence and therefore it is entitled to summary judgment. Eagle Products also argues that the Stovers' claim based upon a breach of the implied warranty of fitness for a particular purpose fails as a matter of law.
Eagle Products' motion to strike challenges the April 5, 1995, affidavit of the plaintiffs' expert, Dr. Frederick W. Oehme. Dr. Oehme is a licensed veterinarian and an expert in veterinary toxicology at Kansas State University in Manhattan, Kansas. Eagle Products contends that the affidavit fails to comply with D.Kan.Rule 206(c) or Fed. R.Civ.P. 56(e). Eagle Products argues that the post-deposition affidavit is merely a shamdrafted in an obvious attempt to evade summary judgment.
*1087 The Stovers oppose Eagle Products' motion for summary judgment and motion to strike. The Stovers contend that Dr. Oehme is a qualified expert and that his opinion is sufficient to survive Eagle Products' attack. The Stovers suggest that Eagle Products' arguments challenging Dr. Oehme's opinions go to the weight, rather than the admissibility of the evidence. The Stovers contend that the issue of causation is one for the jury and that Eagle Products' motion should be denied.
The Stovers contend that Eagle Products' motion to strike is basically an invitation by the defendant for the court to sit as the trier of fact. The Stovers argue that Eagle Products has failed to demonstrate that Dr. Oehme is not qualified or that there are insufficient facts to support his opinion.

Brief Summary of the Facts[1]
In January of 1989, the Stovers began their puppy operation with two small dogs. Marge Stover primarily managed the operation. Eventually the breeding stock was built to a population of approximately three hundred, including fourteen toy breeds, bishons, Chihuahuas, Japanese Chins, dachshunds, Maltese, papillions, Pekingese, pomeranians, toy poodles, pugs, Shih Tzus, shelties, yorkies, westies, cockers and basset hounds. Marge Stover became licensed by the State of Kansas as a dog kennel keeper in 1989. As dogs were purchased to increase the number of breeding stock, none of the dogs were inspected by a veterinarian.
Initially the Stovers' dogs were fed a dog food called "K-9." Almost all of the dogs were fed by a technique allowing the dogs to eat their fill. Pups were fed a product called Eukanuba, a non-Eagle Products product. Beginning in November 1989, adult dogs were fed products manufactured by Eagle Products. The Stovers continued feeding Eagle Products to their breeding stock until January 22, 1992, when the purchase on that date was returned for a refund. The only non-Eagle Products food fed their pups was Eukanuba, which was fed to puppies at five weeks, as well as to nursing mothers.
At the time the Stovers began using Eagle Products' feed, the Stovers noticed no problems associated with the use of Eagle Products' products; losses in the kennel were acceptable and minimal. Marge Stover eventually discontinued using Eagle Products' products because the dogs were not eating it, not because of any other problem. Marge Stover had the feed analyzed, but the report revealed no toxins, aflatoxins, or mycotoxins in the feed. In March of 1992, samples of the feed were again analyzed, but no sign of aflatoxin were found.
The Stovers attribute several defects and abnormalities to the use of Eagle Products' feed. The Stovers claim that low calcium in Eagle Products' dog food caused the problems in their dogs. In an affidavit attached to the plaintiffs' response to Eagle Products' motion for summary judgment, Dr. Oehme states in part:
I have rendered opinions in this case in my "Expert Report" and in my deposition that the anomalies occurring at the Stover Kennels in late 1991 and early 1992 were most probably the result of calcium deficiencies in the Eagle Dog Food that was being fed to the dogs at the Stover Kennels during that period of time. I have stated this opinion to a reasonable degree of certainty.
. . . . .
[I]t remains my opinion that the Stover's (sic) losses are the direct result of a nutritional deficit in the Eagle food product that was being fed during the time period in question."
Affidavit of Frederick W. Oehme, dated April 5, 1995.

Summary Judgment Standards
Although Kansas law supplies the elements of the Stovers' claims,[2] federal law *1088 governs the court's determination of whether Eagle Products is entitled to summary judgment. See Richter v. Limax Intern., Inc., 45 F.3d 1464, 1470 (10th Cir.1995). A court grants a motion for summary judgment if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The substantive law governing the suit dictates which facts are material or not. Id. at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." Id. There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." Burnette v. Dow Chemical Co., 849 F.2d 1269, 1273 (10th Cir.1988).
The movant's burden under Rule 56 of the Federal Rules of Civil Procedure is to lay out the basis of its motion and to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1024 (10th Cir.), cert. denied, ___ U.S. ____, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). "A movant is not required to provide evidence negating an opponent's claim." Committee for First Amendment v. Campbell, 962 F.2d 1517, 1521 (10th Cir.1992) (citation omitted).
If the moving party meets its burden, then it becomes the nonmoving party's burden to show the existence of a genuine issue of material fact. Bacchus Industries, Inc. v. Arvin Industries, Inc., 939 F.2d 887, 891 (10th Cir.1991); see Martin v. Nannie and the Newborns, Inc., 3 F.3d 1410, 1414 (10th Cir.1993) ("If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case."). When the nonmoving party will have the burden of proof at trial, "`Rule 56(e) ... [then] requires the nonmoving party to go beyond the pleadings and by her own affidavits or by the `depositions, answers to interrogatories, and admissions on file,' designate `specific facts showing that there is a genuine issue for trial.'" Mares v. ConAgra Poultry Co., Inc., 971 F.2d 492, 494 (10th Cir.1992) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." Phillips v. Calhoun, 956 F.2d 949, 951 (10th Cir.1992) (citations omitted); see Martin, 3 F.3d at 1414 (non-moving party cannot rest on the mere allegations in the pleadings). "Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." Hedberg v. Indiana Bell Telephone Co., Inc., 47 F.3d 928, 929 (7th Cir. 1995); see Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 479 (1st Cir.1993) ("Optimistic conjecture, unbridled speculation, or hopeful surmise will not suffice."). The court views the evidence of record and draws inferences from it in the light most favorable to the nonmoving party. Burnette v. Dow Chemical Co., 849 F.2d at 1273.
More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed `to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences. Windon Third Oil and Gas v. Federal Deposit Ins., 805 F.2d 342, 346 (10th Cir.1986), cert. denied, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

Expert Testimony under Rules 702 and 703
Rule 702 of the Federal Rules of Evidence states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a *1089 fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Rule 703 of the Federal Rules of Evidence states:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
"A trial judge has broad discretion in determining the competency of an expert witness." Kloepfer v. Honda Motor Co. 898 F.2d 1452, 1458 (10th Cir.1990); see Broadcort Capital Corp. v. Summa Medical Corp., 972 F.2d 1183, 1194-95 (10th Cir.1992) (trial court did not abuse its discretion in finding that witness' general experience, education and training did not qualify him as an expert in the securities area).
In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. ___, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court held that the Federal Rules of Evidence, not Frye, provide the standard for admitting expert scientific testimony in a federal trial. In Frye v. United States, 54 App.D.C. 46, 47, 293 F. 1013 (1923), the court had developed a "general acceptance" test to determine the admissibility of expert testimonyunder the Frye rule, expert opinion based on a scientific technique is inadmissible unless the technique is "generally accepted" as reliable in the relevant scientific community. The Supreme Court held that "[n]othing in the text of [Rule 702] establishes "general acceptance as an absolute requisite to admissibility." 509 U.S. at ___, 113 S.Ct. at 2794, 125 L.Ed.2d at 480.
That the Frye test was displaced by the Rules of Evidence does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence. Nor is the trial judge disabled from screening such evidence. To the contrary, under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.
The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" an expert "may testify thereto." The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Webster's Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science ... But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validationi.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.
Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 3 Weinstein & Berger ¶ 702[02], p. 702-18.
509 U.S. at ___ _ ___, 113 S.Ct. at 2794-2796, 125 L.Ed.2d at 480-481 (footnotes omitted).
Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or *1090 determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.
509 U.S. at ___, 113 S.Ct. at 2796, 125 L.Ed.2d at 482 (footnotes omitted).
In deciding whether an expert's testimony is scientific knowledge that will assist the trier of fact to understand or determine a fact in issue, the district courts may consider any of the following non-exclusive list of factors:
(1) Is the theory or technique capable of being (and has been) tested? ("The criterion of scientific status of a theory is its falsifiability, or refutability, or testability.");
(2) Whether the theory or technique has been subjected to peer review and publication?;
(3) In the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation;
(4) Finally, "general acceptance" can yet have a bearing on the inquiry. "A `reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and express determination of a particular degree of acceptance within that community.'" [509 U.S. at ___, 113 S.Ct. at 2796,] 125 L.Ed.2d at 483 (quoting United States v. Downing 753 F.2d at 1238). "Widespread acceptance can be an important factor in ruling particular evidence admissible, and a `known technique that has been able to attract only minimal support within the community,' Downing, supra, at 1238, may properly be viewed with skepticism."
509 U.S. at ___, 113 S.Ct. at 2796, 125 L.Ed.2d at 483. The Supreme Court emphasized that the inquiry envisioned by Rule 702 is a flexible one. 509 U.S. at ___ _ ___, 113 S.Ct. at 2796-2797, 125 L.Ed.2d at 483-484.
"[T]he `touchstone' of admissibility is helpfulness to the trier of fact." Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 648 (10th Cir.1991). "Moreover, `a lack of specialization does not affect the admissibility of the [expert's] opinion but only its weight,' Wheeler v. John Deere Co., 935 F.2d 1090, 1100 (10th Cir.1991), although `a[n expert] must have skill in the matter to which the subject relates.' Id. (quoting Petition of Central Kansas Elec. Co-op, Inc., 224 Kan. 308, 582 P.2d 228, 236 (1978)). "An expert must, however, stay within the reasonable confines of his subject area and cannot render expert opinions of an entirely different field or discipline." Wheeler, 935 F.2d at 1100.
An expert, relying upon his experience and knowledge of causation factors, may express an opinion which draws a rational conclusion as to causation. Orth v. Emerson Elec. Co., White-Rodgers Div., 980 F.2d 632, 637 (10th Cir.1992). "Absolute certainty is not required." Id.

Theories of Recovery
In the pretrial order, the Stovers contend that Eagle Products is liable under one or more of the following legal theories: (1) breach of the implied warranty of fitness of purpose; (2) breach of the implied warranty of merchantability; or (3) strict liability.

Implied Warranty of Fitness for a Particular Purpose
Eagle Products contends that this claim is easily dispensed as there is no evidence to support the Stovers' implied warranty of fitness for a particular purpose. Eagle Products argues that there is no evidence that it supplied dog food for any purpose other than the feeding of the Stovers' dogs. Because the feeding of dogs is the ordinary use of its products, the Stovers' claim based upon the implied warranty of fitness for a particular purpose fails as a matter of law. Instead, the Stovers must pursue a claim based upon breach of the implied warranty of merchantability. The Stovers do not directly respond to each of these arguments, but "concede that the breach of implied warranty of merchantability is mutually exclusive of the breach of implied warranty of fitness of purpose."
*1091 Eagle Products is entitled to summary judgment on the Stovers' claim based upon the implied warranty of fitness for a particular purpose. "The provisions of K.S.A. 84-2-315, covering the warranty of fitness for a particular purpose, are frequently confused with the implied warranty of merchantability which covers fitness for ordinary purposes. The warranty for a particular purpose is narrower, more specific, and more precise" than the implied warranty of merchantability." Smith v. Stewart, 233 Kan. 904, Syl. ¶ 3, 667 P.2d 358 (1983); see Duffee by and Through Thorton v. Murray Ohio Mfg., 866 F.Supp. 1321, 1322-1323 (D.Kan.1994). "When goods are acquired for the ordinary purposes for which such goods are generally used, no implied warranty of fitness for a particular purpose arises. A use for ordinary purposes falls within the concept of merchantability." Smith, 233 Kan. 904, Syl. ¶ 4, 667 P.2d 358. As Eagle Products suggests, using dog food to feed dogs is the ordinary purpose of the product. See, e.g., Duffee, 866 F.Supp. at 1323 ("A child riding and braking his bicycle are not unusual, but customary uses of a children's bicycle."). Consequently, the Stovers' claim for breach of the implied warranty of fitness for a particular purpose fails as a matter of law.

Implied Warranty of Merchantability/Strict Liability
Eagle Products contends that it is entitled to judgment as a matter of law on the Stovers' remaining claims: breach of the implied warranty of merchantability and strict liability. Eagle Products contends that the Stovers have failed to prove a causal connection between low calcium in Eagle Products' dog food and the defects and abnormalities in the Stovers' dogs. Eagle Products contends that the opinions of Stovers' experts are deficient in the following respects: (1) they are unable to state any conclusion to a reasonable degree of certainty; (2) the methodology used by the plaintiffs' experts is deficient as a matter of law; (3) the facts relied upon by the plaintiffs' experts in reaching their opinions are not the type relied upon by experts in the particular field in forming opinions; Eagle Products essentially asks the court to assume its role as "gatekeeper" to exclude the testimony of Dr. Oehme. See Robinson v. Missouri Pacific R. Co., 16 F.3d 1083, 1088 (10th Cir.1994) ("The Supreme Court's recent decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., ___ U.S. ___, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), reinforces the trial court's special role as gatekeeper with respect to expert evidence and opinion."); or (4) Dr. Oehme's affidavit, attached to the Stovers' response to Eagle Products' motion for summary judgment is a sham and should be stricken.

Analysis
"Regardless of the theory upon which recovery is sought for injury in a products liability case, proof that a defect in the product caused the injury is a prerequisite to recovery." Wilcheck v. Doonan Truck & Equipment, Inc., 220 Kan. 230, 235, 552 P.2d 938 (1976); see, e.g., Duffee, By & Through Thornton v. Murray Ohio Mfg., 879 F.Supp. 1078, 1083 (D.Kan.1995) (no proof that defendant's lack of warnings has a causal connection with the accident); Lane v. Redman Mobile Homes, Inc., 5 Kan.App.2d 729, Syl. ¶ 2, 624 P.2d 984, rev. denied, 229 Kan. 670 (1981) (rule applies to negligence, breach of implied warranties and strict liability claims). "The cause of an injury is that `which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act.'" Voelkel v. General Motors Corp., 846 F.Supp. 1468, 1475 (D.Kan.) (quoting Wilcheck, 220 Kan. at 235, 552 P.2d 938), on reconsideration, 846 F.Supp. 1482 (D.Kan.), aff'd, 43 F.3d 1484 (10th Cir.1994). "Proof of injury during use of the product, without more, is insufficient to establish that a defect in the product caused the injury." Voelkel, 846 F.Supp. at 1475 (citing Wilcheck, 220 Kan. at 235-36, 552 P.2d 938).
When advancing theories of breach of implied warranty of merchantability and strict liability in a products liability case, the plaintiff must prove three elements common to these theories: "(1) There must be a defective product; (2) the defect must have *1092 existed at the time the product left the manufacturer's possession or control; and (3) the defect must have caused the injury sustained by the plaintiffs." Lane, 5 Kan.App.2d at 729 Syl. ¶ 2, 624 P.2d 984; See, e.g., Mays v. Ciba-Geigy Corp., 233 Kan. 38, 53, 661 P.2d 348 (1983) (A prima facie strict liability case includes proof that the product's condition was unreasonably dangerous and that the condition existed when it left the defendant's control); Black v. Don Schmid Motor, Inc., 232 Kan. 458, Syl. ¶ 5, 657 P.2d 517 (1983) (For an implied warranty claim, the buyer must show the goods were defective and the defect existed at the time of sale). "The elements to each of the plaintiff's different legal theories can be proved by direct or circumstantial evidence." Voelkel, 846 F.Supp. at 1476.
Eagle Products contends that the plaintiffs have at best demonstrated a loose temporal relationship between the use of its products and the defects and abnormalities in the Stovers' dogs. While Eagle Products raises numerous valid points, the court will not grant summary judgment on the record before it. Eagle Products' arguments notwithstanding, Dr. Oehme's April 5, 1995, affidavit causes the court to have serious doubt as to the propriety of concluding, as a matter of law, that the plaintiffs have failed to present sufficient facts upon which a rational factfinder could conclude that Eagle Products' feed caused a portion of the Stovers' losses.[3]
The court believes that the better and more prudent course is to deny, without prejudice, Eagle Products' motion for summary judgment and motion to strike affidavit. Dr. Oehme's affidavit was prepared after he was deposed in October of 1994. Although the pretrial order states that discovery shall be complete on or before January 31, 1995, the court authorizes Eagle Products to depose Dr. Oehme with regard to April 5, 1995, affidavit. Within ten days of the date of this order, Eagle Products shall indicate to the court in writing whether it intends to depose Dr. Oehme and the date he is to be deposed. Within thirty days of the date Dr. Oehme is deposed, Eagle Products may file a second or renewed motion for summary judgment on the plaintiffs' remaining claims. If no motion is filed, the case will simply proceed to trial.
The court recognizes that this procedure will require the parties to invest additional time and resources. The court also recognizes that none of the parties requested this alternative relief. The court believes, however, that this procedure will ultimately be beneficial to both the court and the parties. This procedure affords each party the opportunity to re-evaluate their respective positions in light of Dr. Oehme's deposition concerning his April 5, 1995, affidavit. Moreover, even if summary judgment is not granted, this procedure may speed the court's assessment of the admissibility of the plaintiffs' evidence at trial. See Fed.R.Evid. 104(a); Daubert, 509 U.S. at ___, 113 S.Ct. at 2796, 125 L.Ed.2d at 482.
IT IS THEREFORE ORDERED that Eagle Products' motion for summary judgment (Dk. 107) is granted in part and denied in part without prejudice. Eagle Products is granted summary judgment on the Stovers' claim based upon the implied warranty of fitness for a particular purpose. Eagle Products' motion for summary judgment on the Stovers' remaining claims is denied without prejudice.
IT IS FURTHER ORDERED that Eagle Products' motion to strike (Dk. 114) is denied without prejudice.
NOTES
[1] In light of the court's decision, it appears unnecessary to at this juncture to use the court's limited resources to set forth the uncontroverted facts in exacting detail. The court has simply set forth a short summary of the facts necessary to explain the court's decision.
[2] Eagle Products argues, and the Stovers apparently agree, that the substantive law of Kansas applies in this case. See Phillips USA v. Allflex USA, 869 F.Supp. 842 (D.Kan.1994) (Kansas follows lex loci delicti choice of law for tort claims).
[3] Eagle Products correctly argues that a party may not use a sham affidavit simply to create a genuine issue of material fact precluding summary judgment. See Durtsche v. American Colloid Co., 958 F.2d 1007, 1010, n. 2 (10th Cir. 1992); Franks v. Nimmo, 796 F.2d 1230 (10th Cir.1986); Barber v. Hallmark Cards, Inc., No. 93-4087-SAC, 1994 WL 568872, at *5-7, 1994 U.S.Dist. LEXIS 14955, at *14-19 (D.Kan. Sept. 14, 1994) (discussing sham affidavits and striking portions of plaintiff's affidavit). The court is simply unwilling at this point in time to conclude on the record before it that Dr. Oehme's affidavit is a sham.